N THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RALPH DALE ARMSTRONG,

                      OPINION and ORDER

          Plaintiff,

                      12-cv-426-bbc

      v.

JOHN I. NORSETTER, MARION G. MORGAN,
KAREN D. DAILY and DANIEL J. CAMPBELL,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This case has a long history, starting in 1980 with the brutal rape and murder of Charise Kamps in Madison, Wisconsin.  Plaintiff Ralph Dale Armstrong was charged with the crimes and a jury convicted him in 1981.  After several unsuccessful attempts, plaintiff obtained a reversal of his conviction in 2005, when the Wisconsin Supreme Court granted him a new trial on the ground that the jury had not been able to consider important DNA evidence.  However, it was not until 2009 that the charges against plaintiff were dismissed, when a state trial court concluded that various instances of prosecutorial misconduct precluded a retrial.

      In 2012, plaintiff filed this lawsuit without a lawyer, contending that various officials involved in his criminal case had violated his constitutional rights, leading to both his conviction and the delay in the dismissal of his charges after the state supreme court granted him a new trial. (Plaintiff later obtained counsel.)  After reviewing multiple iterations of

1

plaintiff's complaint and entertaining motions to dismiss filed by various defendants, I allowed the following claims to proceed: (1) defendant John Norsetter, the assistant district attorney assigned to plaintiff's case, violated plaintiff's right to due process of law by losing or destroying multiple pieces of potentially exculpatory evidence before plaintiff was tried in 1981; and (2) defendants Karen Daily and Daniel Campbell (two analysts for the state crime lab) and defendant Marion Morgan (a detective for the Madison Police Department) violated plaintiff's right to due process by destroying potentially exculpatory DNA evidence in the form of a semen stain in 2006.  Defendants Norsetter, Daily and Campbell filed an interlocutory appeal, relying on the doctrine of qualified immunity, but the Court of Appeals for the Seventh Circuit affirmed and remanded the case for further proceedings.  Armstrong v. Daily, 786 F.3d 529 (7th Cir. 2015).

Several motions are now before the court:  (1) motions for summary judgment filed by defendant Norsetter, dkt. #117, defendant Morgan, dkt. #130, and defendants Daily and Campbell, dkt. #126; (2) plaintiff's motion for leave to file a supplement to his proposed findings of fact, dkt. #197; (3) defendants Daily's and Campbell's motion to strike the supplemental report of Karl Reich, dkt. #200; and (4) defendant Morgan's unopposed motion to join defendant Daily's motion to strike, dkt. #213.

Taking the motions in reverse order, I am granting defendant Morgan's unopposed motion, but I am denying as unnecessary the motion to strike Reich's supplemental report. Even if I do not consider the opinions in the supplemental report, it makes no difference to the resolution of the summary judgment motions.  I am granting plaintiff's motion for leave

to file a supplement to his proposed findings of fact because I see no unfair prejudice to defendants in allowing him to do so.  Plaintiff does not seek to file new proposed findings of fact; rather, he submitted a handful of newly received documents that provide further support for existing proposed findings of fact.  Defendants do not raise substantive objections to these documents, which is not surprising because they came from the Madison Police Department and the Dane County District Attorney's Office.

With respect to the motions for summary judgment, plaintiff concedes that he does not have sufficient evidence to show that defendant Campbell was involved in a constitutional violation, so I am dismissing Campbell from the case.  However, I am denying the motions for summary judgment as to defendants Norsetter, Daily and Morgan.

Plaintiff's allegations against defendants Norsetter, Daily and Morgan are serious, but the evidence that plaintiff has gathered against these defendants is far from conclusive.  Each of the defendants has a plausible explanation for his or her actions that, if believed, would defeat plaintiff's claims.  However, at this stage of the case, I must draw all reasonable inferences in plaintiff's favor.  Further, the court's task at summary judgment is not to determine which party has the most compelling narrative.  Even when the evidence for one side seems stronger and more persuasive, courts must resist the temptation to weigh the evidence and act as the factfinder. Miller v. Gonzalez, 761 F.3d 822, 827 (7th Cir. 2014); McCann v. Iroquois Memorial Hospital, 622 F.3d 745, 752 (7th Cir. 2010); Kodish v. Oakbrook Terrace Fire Protection District, 604 F.3d 490, 507 (7th Cir. 2010). Because I cannot say that plaintiff's version of events is "so incredible or implausible . . . that a

reasonable jury could not find in his favor," Kodish, 604 F.3d at 507, plaintiff is entitled to a trial so that he may attempt to persuade a jury that defendants violated his constitutional rights. Plaintiff has raised legitimate questions about defendants' conduct that simply cannot be answered in the context of a motion for summary judgment.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. The Crimes

In June 1980, Charise Kamps was raped and murdered. Plaintiff Ralph Armstrong, plaintiff's brother Stephen Armstrong and plaintiff's fiancée Jane May all spent time with Kamps the day she died. May found Kamps's body in Kamps's apartment in Madison, Wisconsin, on June 24, 1980, around 12:40 p.m.

### B. Plaintiff's Discussions with the Police

On June 24, 1980, around 2:00 p.m., plaintiff went to the police station, where he was questioned by detectives. Plaintiff waived his Fifth Amendment rights and voluntarily gave statements to the police. Plaintiff told detectives that Kamps had been looking for cocaine, but that he had not used cocaine with Kamps the night that she was murdered. (Later, police received a report that Kamps had been murdered in the context of a drug deal.) In addition, he consented to the search of his person, car and apartment.

4

## C.  Defendant Norsetter's Assignment to the Case

James Doyle (the district attorney at the time) assigned the Kamps case to defendant John Norsetter, who had been an assistant district attorney for two and a half years. Norsetter had prosecuted only one other murder case, a few months earlier.  During his investigation of the case, Norsetter became convinced that plaintiff had murdered Kamps and he became resolved to "work vigorously to ensure that [plaintiff] was convicted." Trans., April 1, 2009 hearing, dkt. #152 at 68.  Once he was convinced, Norsetter would not change his mind regardless what the forensic tests might show.  Id. at 94-95.

Before a charging decision was made, defendant Norsetter assisted police with their investigation.  Detectives sought legal advice from Norsetter about various issues.

On June 24, 1980, Doyle and defendant Norsetter went to the crime scene, arriving at 2:10 p.m.  It was the first time that Norsetter had been at the scene of a murder and it made him "emotional."

Doyle and defendant Norsetter remained together for the duration of the visit, which lasted only a few minutes.  They did not progress further than a step or two into the apartment.  Although Norsetter took notes during the visit, he does not know what happened to those notes.

Defendant Norsetter returned to the City County Building, which houses both the police department and the district attorney's office.  According to a June 24, 1980 police report, while at the police station, Detective David Listug asked Norsetter whether the detective could interview plaintiff's fiancée.

D.  Handling of Drug-Related Items

Between 9:25 p.m. and 9:50 p.m. on June 24, 1980, detectives John Sheskey, Charles Cole, and David Listug were at the Kamps apartment to collect and catalog the drug-related evidence found at the scene.  Det. Listug took the following items from Kamps's kitchen table: two mirrors, a silver snorting straw and a razor blade.  All of those items may be used to ingest cocaine.

Although the police looked for fingerprints throughout Kamps's apartment, the mirrors, straw and razorblade were never tested for fingerprints. There is no record that defendant Norsetter requested that these items be tested or that he even inquired about their existence.

According to a June 24 police report, these items "were destroyed" by Detective Listug.  No reason is given for doing this.

According to Dennis Walker, plaintiff's police practices expert, "because of the substantial potential importance for the evidence, including exculpatory evidence that the real murderer's fingerprints could be on the mirrors, a reasonable detective would not have destroyed the evidence without being directed to by a superior officer or prosectuor."  Dkt. #186 at 8.  According to Grant Humerickhouse, a detective with the Madison Police Department who testified about "the policies related to the destruction of recovered evidence at the Madison Police Department from 1980 to present," dkt. #164 at 5, "[i]n 1980, a detective could use [his or her] discretion to keep or destroy evidence based on any number of factors, per policy," id. at 47.  One of the factors influencing that discretion was whether

6

the district attorney's office was involved in the investigation.  Id. at 36.

In a June 25, 1980 police report, Detective Listug stated that "originally [he] was going to destroy the drug items seized from" Kamps's apartment, but instead he inventoried them under property tag H2844 after speaking with Jeffrey Frye, a lieutenant.  The June 25 report does not identify what the "drug items" were.  At his deposition, Detective Listug could not recall his conversation with Frye or the items that he inventoried.  Though most of the property tags generated in the investigation listed all of the items included under the tag, H2844 does not identify the items inventoried.

In 1985, Theodore Mell, a detective supervisor, authorized the destruction of the items included under H2844.  In 1994, department records show another authorization for the destruction of the same items.


E.  Lineup

On July 3, 1980, defendant Norsetter set up a procedure for witness Ricci Orebia to identify the person she saw going  in and out of Kamps's apartment building between 3:00 a.m. and 4:00 a.m. on June 24, 1980.  Several aspects of the lineup were suggestive:  (1) only plaintiff was carried across the street; (2) at least two of the participants had on obvious wigs; and (3) the other two did not match the witness's description at all because they were "fat"; in addition, one had straight hair.  Orebia picked plaintiff out of the lineup.

After the lineup, Orebia told plaintiff's lawyer that plaintiff was "not the guy. He's too tall." After that, Orebia was contacted by the police and they brought her to the police

department.  "Somebody" at the department told her, "stop talking, you're wrecking our case."  She does not remember who made the statement or whether Norsetter was present.

### F. Plaintiff is Charged and Convicted

On August 12, 1980, defendant Norsetter filed a criminal complaint, charging plaintiff with sexually assaulting and murdering Kamps.  On March 24, 1981, a jury convicted plaintiff of both crimes.  Plaintiff continued to maintain his innocence, filing multiple challenges to his conviction in both state and federal court.  These challenges were unsuccessful for 25 years.

### G. Allegation against Stephen Armstrong

In 1995, defendant Norsetter received a telephone call from a witness, Deborah Holsomback, who told Norsetter that Stephen Armstrong (plaintiff's brother) had confessed to Kamps's murder.  In response, Norsetter told Holsomback that he "had the right man." (It is disputed whether Norsetter also stated that he "would never listen to any other evidence.")  Norsetter did not follow up on Holsomback's statement.

### H. Defendant Daily Joins the Case

Defendant Karen Daily was a senior forensic scientist in the Wisconsin State Crime Lab.  In 2000 or 2001, defendant Daily was assigned to the Kamps case.  Because Daily had not been part of the case since the beginning, the police department sent her "all the

8

documentation and photographs" the department had that were related to the case.  Dkt. #113 at 249.  She reviewed at least some of this material.

## I. Plaintiff's Conviction is Vacated

On July 12, 2005, the Wisconsin Supreme Court granted plaintiff a new trial, relying on evidence that was not available in 1981 to conclude that "the real controversy was not fully tried."  State v. Armstrong, 2005 WI 119, ¶ 163, 283 Wis. 2d 639, 700 N.W.2d 98. In particular, the court relied on (1) DNA testing of two hairs found on Kamps's robe belt, which excluded plaintiff as the source; (2) the absence of any finding of blood on "a piece of cloth accompanying slides allegedly prepared from the hemostick swabs and scrapings from [plaintiff]'s thumbs and large toes"; and (3) a 1990 DNA analysis that excluded plaintiff as the source of the semen on Kamps's bathrobe.  Id. at ¶ 95.

On July 20, 2005, plaintiff's brother, Stephen Armstrong, died.  His body was cremated.  (The parties do not say how he died or who made the decision to cremate his body.)

## J. Defendant Morgan's Assignment to the Case

Defendant Marion Morgan was a detective in the Madison Police Department's "sensitive crimes unit."  After the state supreme court's decision, she was the lead detective on the case, which meant that she was responsible for determining the direction of the investigation and deciding who should be interviewed.  Defendant Norsetter was still

working for the district attorney's office, so the case was reassigned to him.

On July 27, 2005, defendants Norsetter, Daily and Morgan participated in a meeting to discuss DNA testing of various pieces of evidence.  In an email dated the same day, analyst Daily wrote, "Y-STRs?  Just wondering."  Y-STR is a type of DNA testing.  It is different from a STR test in that the Y-STR test specifically analyzes markers or areas of the DNA on the Y chromosome, so it is specific to male individuals.  It cannot distinguish among paternal relatives, but Daily did not disclose this limitation.

## K. Procedures for the Testing of Evidence

On December 19, 2005, the Circuit Court for Dane County issued the following order: "That any items the state wishes to be examined and/or tested by an expert shall not be removed from their current secured location or state without prior notice to the Defense."  In a stipulation accompanying the order, a pink robe belt was listed as an item that "may need to be tested."  No later than January 5, 2006, both Detective Morgan and analyst Daily were aware of the contents of this order.

On January 5 and 6, 2006, defendant Morgan, defendant Norsetter, Jerry Buting (plaintiff's lawyer at the time) and two other officers met to review the evidence and determine which pieces would be sent to the Wisconsin State Crime Lab.  One of the items was a bathrobe belt that had been found draped over Kamps's body.  This was an important piece of evidence because it contained semen stains that could belong to the killer and because it could have been handled by the killer.

On January 9, 2006, defense counsel Buting sent Norsetter, Morgan and Daily a letter to follow up a discussion on January 6. Buting objected to previous instances in which Daily had handled evidence without notifying him. In addition, Buting objected to letting the state crime lab handle evidence in the future and he asked for review by an "independent forensic laboratory." In the alternative, he stated that no exhibits should be examined or tested by the state crime lab unless a representative from the defense was present. He "strongly urge[d]" Daily to avoid handling the exhibits until further notice. (Although Detective Morgan is not listed as a recipient of this letter, she admits that she received it.)

## L. Daily's Testing of the Robe Belt

On January 11, 2006, defendant Norsetter's co-counsel on plaintiff's case called analyst Daily to start working on the case. After checking with her supervisor, Daily followed counsel's instructions. Daily identified four possible semen stains on the belt, which she labeled "Item Z"; she labeled one of the stains "Z3." (The parties do not argue that the other stains have any relevance to this case.)

On January 31, 2006, defendant Daily began a DNA analysis of the robe belt. She separated the Z3 extraction into a sperm and a nonsperm fraction and created a pellet slide to look for the presence of sperm from the sperm fraction of the stain. It is beneficial to separate out the sperm and the nonsperm fraction because, when there is a sperm donor, often there will be DNA material from a second person as well and separating the sperm from the non-sperm fraction allows analysts to separate out and identify the two

contributors.

After defendant Daily split the sperm and the nonsperm fractions from Z3, Daily "quantitated" the sperm fraction of the Z3 extract to see how much human DNA was present. Daily amplified the DNA using the polymerase chain reaction method and typed for 15 short tandem repeat loci as well as the gender marker Amelogenin using Promega's PowerPlex 16 amplification kit.  Daily attempted to do an autosomal DNA typing, also known as an STR test, on the sperm fraction of the Z3 extract.

Through the STR testing of the sperm fraction of the Z3 extract, Daily determined that the DNA profile from Z3 was predominantly female, but a trace amount of male DNA was also present.  With respect to the female DNA, Daily was able to get a partial DNA profile that was consistent with Charise Kamps, the victim.  Daily was unable to get a male STR profile on the sperm fraction of the Z3 extract because there was not enough male DNA to create a full profile.

On April 10, 2006, Daily generated a report that excluded plaintiff as the source of DNA on the following items of evidence from the Kamps murder scene: (1) the semen stain from the robe belt; (2) the semen stain from the bedspread; (3) a semen stain on jeans; (4) a semen stain on panties; (5) a brown packet; (6) a $20 bill; and (7) various hairs found throughout Kamps's apartment.  With respect to the robe belt, Daily wrote:

> Partial DNA profiles were developed from another stain on the robe belt (item Z, stain 3) and the bedspread (item AA, stain 5). These DNA profiles are not consistent with the DNA profile developed from the buccal cell standard (item BD) from Brian Dillman, who was Charise Kamps' boyfriend, or the blood standard (item BE) from Ralph Armstrong.

12

* * *

Ralph Armstrong is eliminated as the source of the DNA profiles from . . . [i]tem Z3 – a semen stain on the robe belt.

Even after these tests, a portion of the stain remained on the belt, large enough to be tested.  Defendant Daily sent the report to defendant Morgan.

With the consent of plaintiff's counsel, hair found at the crime scene was sent to a third party lab for testing.  Plaintiff was excluded as the source of the hair.

## M. More Allegations relating to Stephen Armstrong

On May 10, 2006, Det. Morgan met with Tammy Bartels, who told Morgan that a business owner named Bonnie Smith believed that Stephen Armstrong (plaintiff's brother) was the real murderer.  (The parties do not say who these women are or how Smith would have been in a position to know the identity of the killer.)  Morgan did not try to contact Smith.  Morgan's police report on her discussion with Bartels is dated November 1, 2006, six months after her meeting with Bartels.

In August 2008, Morgan traveled to Texas to speak with Debbie Holsomback and Fawn Cave, two women who alleged that Stephen Armstrong had confessed in 1995 that he committed the Kamps murder.  Morgan asked Cave about her relationship with plaintiff, but Morgan did not ask her about her allegation against Stephen.  In addition, Morgan obtained "hundreds" of pages of documents about Cave's "custody issues."  Dkt. #115 at 151. Morgan said that the reason for doing was to obtain "background" information on Cave.

13

### N. Norsetter Declines to Dismiss the Charges

On June 6, 2006, at a court hearing, defendant Norsetter stated that it was his intent to continue with the prosecution against plaintiff. Defense counsel Buting said that he wanted some evidence to be retested.

### O. Additional Testing of the Robe Belt

After the June 6 hearing, defendants Norsetter and Morgan called defendant Daily to discuss the robe belt. (Plaintiff says this call occurred within a day or two of June 6; Morgan says it was June 21.) When the possibility of Y-STR testing was discussed, Daily stated that Y-STR testing was "less discriminating" than other tests and that it was better used as a test for eliminating someone rather than identifying someone. In other words, Y-STR testing does not generate a unique DNA profile. One way in which Y-STR testing is less discriminating is that it cannot distinguish among paternally related relatives.

When she was deposed in 2016, defendant Daily knew that Y-STR testing could not distinguish among paternally related relatives. Defendant Morgan had received training about DNA testing. A 2005 lab report addressed to Morgan states, "all paternally related male relatives will share the same Y-STR profile." Dkt #197-5.

During their telephone conversation, defendants Norsetter, Daily and Morgan agreed that Y-STR testing would be performed on the remaining sample. Defendant Daily did not document this telephone conversation, even though state crime lab policy required her to do so and even though she had documented many other conversations that she had had with

14

Morgan and Norsetter.  There is no documentation from Morgan or Daily or anyone else regarding the reasons that Y-STR was chosen as the testing method.  Further, Daily has preserved no emails regarding the decision.

On June 26, 2006, defendant Morgan took the robe belt from the clerk of court to state crime lab for additional testing.  She did not inform plaintiff's counsel.  Further, she did not document the removal of the evidence with a "routing and transmittal slip," even though she had used such a slip to document other occasions on which she had moved evidence.

Defendant Daily took custody of the belt.  Although it would be normal procedure for an evidence specialist to receive the evidence first, no record exists of that occurring on June 26.  Like Morgan, Daily did not give notice to plaintiff's counsel.

On July 6, 2006, after taking custody of the belt, Daily combined two DNA samples, one sperm fraction from the April 2006 testing and another sperm fraction that she generated in June 2006.  In doing so, Daily consumed all remaining DNA evidence from the stain on the robe belt.

After she was finished, defendant Daily sent the combined extracts to defendant Daniel Campbell, another state crime lab analyst, asking him to conduct Y-STR testing.  Daily did not tell Campbell that she had combined extracts and she did not explain why Y-STR testing was appropriate.

Campbell conducted Y-STR testing on the sample, consuming all of the sperm extract in the process.  Campbell did not consume all of the nonsperm fraction.  (The parties dispute

15

whether Daily and Campbell could have conducted a different test to obtain an STR profile.)

Defendant Campbell's test revealed a human DNA allele 16 in the "manipulation control evidence," which should not have contained human DNA. This suggests either that contamination occurred or that the allele is from "a contributor to the nonsperm fraction." Plaintiff was excluded as the source of the allele. However, the results showed that the major DNA component from the nonsperm fraction of the Z3 extract was consistent with the Y-STR profile obtained from plaintiff, so he could not be eliminated as the donor. The Y-STR test conducted by Campbell is the only DNA evidence from the case that did not exclude plaintiff as a source.

Plaintiff's lawyer did not receive notice of the testing until August 2006.

P. Dismissal of the Charges

On July 31, 2009, the Circuit Court for Dane County, Wisconsin, granted plaintiff's request to dismiss the charges against him on the ground of prosecutorial misconduct. In particular, the court pointed to (1) the prosecution's failure to give notice to plaintiff's counsel about the additional Y-STR testing in 2006, resulting in plaintiff's inability to conduct reliable tests of his own; and (2) the prosecution's failure to disclose evidence that plaintiff's brother, Stephen Armstrong, had confessed to Kamps's murder. The court concluded that plaintiff had been unfairly prejudiced by these actions because the Y-STR testing resulted in the total consumption of the sperm fraction of the sample; it was likely that the remaining nonsperm fraction was contaminated during the testing; and plaintiff had

16

no way of obtaining a DNA sample from Stephen Armstrong because his body had been cremated when he died.

## OPINION

## I.   CLAIM AGAINST JOHN NORSETTER

Plaintiff is proceeding on a claim that defendant Norsetter violated his right to due process by causing the destruction of potentially exculpatory evidence in 1980. In particular, plaintiff alleges that Norsetter was involved in the decision to destroy two mirrors, a silver snorting straw and a razor blade that were found in Kamps's apartment. These items were potentially exculpatory, plaintiff says, because the killer's fingerprints could have been on them. According to plaintiff, the night before Kamps died, she had stated that she wanted to use cocaine. Because the items allegedly destroyed could be used to ingest cocaine and plaintiff denied using cocaine with Kamps the night before she died, plaintiff believes that the items could have been covered with the fingerprints of the killer. Plaintiff's theory is that Norsetter knew the items could be exculpatory and he intentionally destroyed the items to prejudice plaintiff's defense because Norsetter personally was convinced that plaintiff was guilty. (Plaintiff raised other claims against Norsetter in his complaint, but I dismissed these on the ground that Norsetter was entitled to prosecutorial immunity. Dkt. #81; Imbler v. Pachtman, 424 U.S. 409 (1979) (prosecutor has absolute immunity for actions taken as prosecutor). The claim regarding destruction of the drug-related items was not dismissed because it related to Norsetter's actions as an investigator rather than a prosecutor.)

Defendant Norsetter raises three arguments in his motion for summary judgment: (1) plaintiff filed this case after the statute of limitations had expired; (2) plaintiff has failed to adduce sufficient evidence to show that the allegedly exculpatory evidence was lost or destroyed before plaintiff's 1981 trial; and (3) even if the evidence was lost or destroyed, plaintiff has failed to adduce sufficient evidence to show that Norsetter was responsible for the loss.  I will address each argument in turn.

## A. Statute of Limitations

Defendant Norsetter could have a raised a statute of limitations defense in his motion to dismiss or in a motion for judgment on the pleadings because all the facts relevant to this argument were included in the complaint.  Norsetter does not explain why he waited so long to seek dismissal on this ground.  Regardless, I conclude that plaintiff's complaint in this case was timely.

In Wisconsin, the statute of limitations for a claim under the Constitution is six years. Reget v. City of La Crosse, 595 F.3d 691, 694 (7th Cir. 2010).  Whether plaintiff filed his claim against Norsetter within the limitations period is contingent on the date his claim accrued.  Norsetter says the claim accrued in 2005, when the Wisconsin Supreme Court reversed plaintiff's conviction and ordered a new trial; plaintiff says that his claim against Norsetter did not accrue until 2009, when his charges were dismissed and he was released from prison.  Plaintiff filed this lawsuit in 2012, so he missed his deadline if defendant is correct about the accrual date.  Further, plaintiff does not argue that he is entitled to

18

equitable tolling, so I must dismiss this claim if I agree with defendant regarding the accrual date.

Generally, a constitutional claim accrues "when the plaintiff knows or should know that his or her constitutional rights have been violated." Logan v. Wilkins, 644 F.3d 577, 581-82 (7th Cir. 2011). Neither plaintiff nor defendant Norsetter discuss in their briefs the date that plaintiff knew or should have known that Norsetter allegedly directed the destruction of the drug evidence because both sides seem to assume that the rule first articulated in Heck v. Humphrey, 512 U.S. 477 (1994), delayed the accrual of plaintiff's claim, though they disagree about how long the delay was. Under Heck, "a section 1983 suit can't be brought if a judgment in favor of the plaintiff would imply that his conviction in a prior proceeding had been invalid." Rollins v. Willett, 770 F.3d 575, 576 (7th Cir. 2014). In Rollins, 770 F.3d at 576, the court gave the example of an individual who had been convicted of illegal drug possession. Under Heck, that individual could not bring a claim that an officer had planted the drugs because that claim would necessarily imply that the individual's conviction was invalid. Id. In this case, the parties seem to agree that Heck barred plaintiff's claim against Norsetter while plaintiff's conviction remained valid.

However, the parties disagree about the effect of the decision of the Wisconsin Supreme Court to reverse plaintiff's conviction. The rule of Heck is that "a plaintiff may not recover damages under § 1983 when a judgment in his favor would necessarily imply the invalidity of a criminal conviction or sentence that has not been *reversed*, expunged, invalidated, or otherwise called into question." Matz v. Klotka, 769 F.3d 517, 530 (7th Cir.

2014) (emphasis added).  Thus, defendant Norsetter argues that, once the state supreme court reversed plaintiff's conviction, <u>Heck</u> was no longer an impediment to plaintiff's civil claim.

Although charges were still pending after the reversal, defendant Norsetter says that plaintiff's situation was similar to that of the plaintiff in <u>Wallace v. Kato</u>, 549 U.S. 384, 392-93 (2007), in which the Supreme Court held that <u>Heck</u> does not delay the accrual date for a Fourth Amendment false arrest claim, even if it is possible that a finding in the plaintiff's favor could be inconsistent with a *future* conviction.  In addition, Norsetter cites <u>D'Ambrosio v. Marino</u>, 747 F.3d 378, 385 (6th Cir. 2014), in which the court stated that "<u>Wallace</u>'s pretrial principles [apply] to the retrial context."  In other words, the possibility of a retrial after a conviction is reversed does not delay accrual of a claim.  In accordance with that view, the court held that a claim for failing to turn over exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), accrued when a court vacated the plaintiff's conviction.  The court rejected the plaintiff's argument that "the statute of limitations does not begin to run until after the state court criminal proceedings against the plaintiff have 'terminated' in the plaintiff's favor—which . . . does not occur as long as the state retains the ability to retry the plaintiff."  <u>D'Ambrosio</u>, 747 F.3d at 384.

For his part, plaintiff relies on <u>Julian v. Hanna</u>, 732 F.3d 842, 845 (7th Cir. 2013), in which the court held that "a malicious prosecution claim does not accrue until the criminal proceeding that gave rise to it ends in the claimant's favor," which does not occur "until the charges [are] dismissed."  The court did not explain its reasoning, but simply cited

various other federal and state authorities, including <u>Brooks v. Ross</u>, 578 F.3d 574, 578-79 (7th Cir. 2009).  In <u>Brooks</u>, the court explained that one of the *elements* of a malicious prosecution claim is "termination of a prosecution in the [criminal] defendant's favor."  <u>Id.</u> at 579.  Thus, the accrual date of a malicious prosecution claim is less about the potential conflict with a conviction and more about ripeness.  The claim is simply not complete until the prosecution is terminated.  This is consistent with <u>Wallace</u>, 594 U.S. at 388, in which the Court stated that a cause of action accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."  Obviously, a plaintiff cannot sue until all the elements of his claim are present.

Under <u>Julian</u>, the question is not whether plaintiff's conviction barred his claim against defendant Norsetter, so the parties' debate over the scope of <u>Heck</u> seems to be a bit of a red herring.  Rather, the question is whether the claim includes favorable termination as an element.

Plaintiff acknowledges that he is not bringing a malicious prosecution claim against Norsetter; his claim is that Norsetter destroyed exculpatory evidence in the context of the murder investigation.  However, plaintiff points to the broader language in <u>Brooks</u> and <u>Snodderly v. R. U.F.F. Drug Enforcement Task Force</u>, 239 F.3d 892 (7th Cir. 2001), that "claims *resembling* malicious prosecution do not accrue until the prosecution has terminated in the plaintiff's favor."  <u>Id.</u> at 900 (emphasis added).  Although the court did not explain how to determine whether a claim "resembles" malicious prosecution, I need not struggle with that question because the Supreme Court already resolved it as it applies to this case.

In <u>Heck</u>, one of the plaintiff's claims was that the defendants "knowingly destroyed evidence which was exculpatory in nature and could have proved [the plaintiff's] innocence." <u>Heck</u>, 512 U.S. at 479 (internal quotations omitted).  In describing this and the other claims the plaintiff brought, the Court stated that "[t]he common-law cause of action for malicious prosecution provides the closest analogy to claims of the type considered here." <u>Id.</u> at 484.

Regardless whether the court in <u>D'Ambrosio</u> is correct that some claims implicating a fair trial could accrue as soon as a judgment is vacated or reversed, I conclude that plaintiff's claim did not accrue until his charges were dropped.  If one combines the quoted statement in <u>Heck</u> with the holding in <u>Brooks</u> and <u>Snodderly</u> that claims analogous to malicious prosecution do not accrue until charges are dismissed, this leads to the conclusion that plaintiff's claim against Norsetter is timely.  Further, if I adopted defendant Norsetter's argument, it would require a plaintiff "to bring a separate section 1983 suit while defending against criminal charges in a retrial," <u>Julian</u>, 732 F.3d at 849, which seems both unfair and unrealistic.  In any event, regardless whether defendant Norsetter's argument makes sense as a policy matter, it is inconsistent with the law of this circuit.


B.  <u>Sufficiency of the Evidence</u>

Defendant Norsetter's remaining two arguments are evidentiary.  In particular, Norsetter argues that plaintiff has not adduced sufficient evidence to show that (1) the evidence at issue (two mirrors, a razor blade and a straw) was lost or destroyed before plaintiff's 1981 trial; or (2) if the evidence was lost or destroyed, Norsetter had anything to

do with it. Norsetter does not argue that plaintiff is required to prove that Norsetter acted in bad faith, or, if that is a requirement, that plaintiff has insufficient evidence to prove that Norsetter acted in bad faith, so I do not consider those questions. Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

With respect to the first issue, the June 24, 1980 police report states that the mirrors, razor blade and straw "were destroyed" by Detective Listug. Defendant Norsetter points to other evidence undermining the June 24 report, such as a June 25 report stating that Detective Listug changed his mind about destroying unspecified "drug items" and instead placed the items in storage. However, defendants have not shown as a matter of law that the mirrors, razor blade and straw were not destroyed, although it is their burden to do so on a motion for summary judgment. The June 24 report is sufficient to raise a genuine issue of material fact on this question.

It is a much closer question whether plaintiff has adduced sufficient evidence to show that defendant Norsetter was involved in the alleged decision to destroy the items. Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012) ("An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation."). No witness with personal knowledge has testified that Norsetter directed Detective Listug to destroy the items or that Norsetter even knew about the items' existence on June 24,

1980.  However, plaintiff says that various pieces of circumstantial evidence would allow a reasonable jury to find that Norsetter was involved in the decision, including the following:

(1) evidence that, on the same day that Detective Listug collected the items, he spoke to Norsetter at the police station, asking Norsetter for permission to interview a witness (suggesting that Listug also would have asked Norsetter for permission before destroying evidence);

(2) evidence that Norsetter was involved in other decisions during the investigation, such as the identification procedure;

(3) testimony from a Madison police detective, who said that one of the factors influencing an officer's discretion in choosing whether to destroy evidence was whether the district attorney's office was involved in the investigation;

(4) the opinion of plaintiff's expert on police practices, who said that a reasonable officer would not have chosen to destroy the items on his own because of the obvious possibility that the killer's fingerprints could be on the items; and

(5) the lack of any evidence that Norsetter ever inquired about the items despite their potential importance (suggesting that he knew they had been destroyed and approved of that decision).

I agree with plaintiff that it would be surprising for an officer to destroy such potentially relevant evidence without approval, especially on the first day of an investigation, when it is still unclear what evidence might be important.  Defendant Norsetter does not point to any evidence that would explain Detective Listug's actions.  Although the evidence

24

implicating Norsetter in particular is thin, on a motion for summary judgment, the court may not weigh the evidence or determine which side has a more persuasive argument. <u>Washington v. Haupert</u>, 481 F.3d 543, 549 (7th Cir. 2007).  The evidence plaintiff cites regarding Norsetter's involvement in other investigation decisions and Norsetter's lack of interest in the evidence despite its potential importance is sufficient to raise a genuine issue of material fact, if only barely.  Accordingly, I conclude that plaintiff is entitled to present his claim against defendant Norsetter to a jury.

## II.  CLAIMS AGAINST DAILY AND MORGAN

Like plaintiff's claim against defendant Norsetter, plaintiff's claim against Detective Morgan and analyst Daily relates to the alleged destruction of evidence.  In particular, plaintiff alleges that Daily and Morgan conspired to destroy a semen sample that could exonerate plaintiff.

Plaintiff's theory on this claim is that Daily and Morgan were influenced by Norsetter's alleged bias against plaintiff or were otherwise more concerned about preserving plaintiff's conviction than finding the true killer, so they agreed to analyze a semen stain found on Kamps's robe belt with a DNA test that would both falsely implicate plaintiff and prevent him from conducting a more reliable test.  The potential for a misleading result arose because plaintiff's brother, Stephen Armstrong, was also a potential suspect and the test defendants chose could not distinguish among paternal relatives.  Plaintiff alleges that Daily and Morgan knew this and intentionally consumed all of the remaining semen sample so

25

that plaintiff could not run a more accurate test.

Defendants Daily and Morgan each filed their own motion for summary judgment, raising some of the same issues and many different ones.  I discuss each of them below.

### A.  Absolute Immunity (Defendant Daily Only)

Defendant Daily argues that she is entitled to absolute immunity under the doctrine articulated in Briscoe v. LaHue, 460 U.S. 325 (1983), which gives a trial witness immunity from a claim that she gave perjured testimony.  Of course, plaintiff is not suing Daily for her testimony but rather for tampering with evidence and then destroying it.  However, Daily says that Briscoe applies because the alleged conduct was part of "preparing to testify" in the criminal case.  Daily Br., dkt. #137, at 32.  She says that this extension of Briscoe is required by Buckley v. Fitzsimmons, 919 F.2d 1230 (7th Cir. 1990), rev'd on other grounds, 502 U.S. 801 (1991).

Like defendant Norsetter's statute of limitations argument, this is an argument that could have been raised in a motion to dismiss, but Daily chose not to do so, for reasons she does not explain.  Even now, Daily seems to realize that her chances of prevailing on this argument are slim.  Although absolute immunity is a threshold question, she puts her argument at the end of her opening brief and devotes only a page and a half to the issue,.

Defendant Daily was right not to raise this issue in her motion to dismiss and she should have known better than to raise it now.  In Buckley, 919 F.2d at 1244-45, the court of appeals gave immunity to expert witnesses for "pretrial activities," such as evaluating a

26

print of a boot, "writing reports, discussing the case with prosecutors and preparing to testify." In applying <u>Briscoe</u> to these activities, the court stated that the question was whether the plaintiff was trying to "litigate the substance of [the witness's] testimony." <u>Buckley</u>, 919 F.2d at 1245. The court concluded that it was "clear that the testimony is the real gravamen of [the plaintiff's] complaint" about the expert witnesses. <u>Id.</u>

In this case, plaintiff is trying to attack Daily's alleged conduct rather than her conclusions, so <u>Buckley</u> does not apply. In fact, in <u>Buckley</u>, the court distinguished its facts from a situation in which the expert allegedly hid evidence. <u>Id.</u> Because that is essentially what plaintiff is alleging in this case, Daily is not entitled to absolute immunity. There is simply no plausible argument that the alleged destruction of evidence in this case is a testimonial act.

## B. Standard of Review (Defendant Morgan Only)

In its opinion on the interlocutory appeal in this case, the Court of Appeals for the Seventh Circuit identified two legal theories plaintiff was asserting with respect to the destruction of the semen stain evidence. "First, he argues the exculpatory value of the semen sample was apparent to Daily and Campbell so that its destruction was plainly unlawful under [California v.] Trombetta, 467 U.S. [479] at 488–89 [(1984)]. In the alternative, he argues that even if the semen sample was only potentially exculpatory, Daily and Campbell acted unlawfully because they destroyed it in bad faith. <u>See</u> [Arizona v.] Youngblood, 488 U.S. [51] at 58 [(1988)]." <u>Armstrong v. Daily</u>, 786 F.3d 529, 551 (7th Cir. 2015). The

27

court stated that "[b]oth theories are sufficient to assert a violation of Armstrong's right to due process of law."   Id.

Defendant Morgan argues that the court of appeals summarized the law incorrectly. (Defendant Daily does not join this argument.)   Relying on cases such as McCarthy v. Pollard, 656 F.3d 478, 485 (7th Cir. 2011), Morgan argues that a plaintiff bringing a destruction of evidence claim must prove in every case both that (1) the defendant acted in bad faith; *and* (2) the evidence destroyed was "apparently exculpatory."

This argument appears to be inconsistent with Youngblood itself, in which the Court stated, "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."   Youngblood, 488 U.S. at 58.   In this case, the court of appeals paraphrased Youngblood's holding as "the destruction of potentially exculpatory evidence is not a denial of due process of law unless it is done in bad faith."   Armstrong, 786 F.3d at 546.   See also Illinois v. Fisher, 540 U.S. 544, 549 (2004) (Youngblood bad faith requirement applies when evidence is "potentially useful").   As plaintiff points out, it is also inconsistent with another recent case (ignored by Morgan), in which the court of appeals cited Youngblood and Trombetta for the proposition that an "officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith."   Hart v. Mannina, 798 F.3d 578, 589 (7th Cir. 2015).   Other circuits seem to follow the rule as summarized in Armstrong.   E.g., United States v. Harry, 816 F.3d 1268, 1276 (10th Cir. 2016); Magraw v. Roden, 743 F.3d 1, 8 (1st Cir. 2014); Moldowan

v. City of Warren, 578 F.3d 351, 386 (6th Cir. 2009); United States v. Moore, 452 F.3d 382, 388 (5th Cir. 2006); United States v. Estrada, 453 F.3d 1208, 1212–13 (9th Cir. 2006).  Adopting defendant Morgan's rule would have troubling public policy implications because it would allow public officials to destroy evidence for the sole purpose of prejudicing the accused, so long as it was not obvious that the evidence would help to exonerate the accused.  It seems doubtful that the Supreme Court or the court of appeals would want to encourage such tactics.

All this being said, Morgan is correct that Armstrong is at odds with McCarthy.  In particular, in McCarthy the court listed three elements for a destruction of evidence claim: "(1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." McCarthy, 656 F.3d at 485.  (Although the court of appeals did not discuss the third element in Armstrong, plaintiff assumes that he must prove that element, so I will do the same.)  Thus, McCarthy is consistent with defendant Morgan's argument that a plaintiff must prove in every case both that the defendants acted in bad faith *and* that the evidence was apparently exculpatory before its destruction.

This leaves the court with a potential dilemma: follow McCarthy or Armstrong?  Morgan says that this court should follow McCarthy because she was not a party to the appeal (because she did not file a motion to dismiss in the district court) and therefore she believes that the decision does not apply to her.   However, she cites no authority for the

29

view that I may disregard the law of the case whenever one party did not participate in the appeal.  Waid v. Merrill Area Public School, 130 F.3d 1268, 1272 (7th Cir.1997) ("The most elementary application of [law of the case] doctrine is that when a court of appeals has . . . remanded the case, the district court is required to comply with the express or implied rulings of the appellate court.") (internal quotation marks omitted).  For his part, plaintiff says that McCarthy is distinguishable because it is a habeas case, but he does not explain why the standard should be different in that context.

In her reply brief, defendant Morgan argues that the court of appeals' summary of the elements in Armstrong is not binding because it is dicta, but she does not explain why she believes this.  In fact, the summary of the law in McCarthy was dicta because, in that case, the court found both that the officers did not act in bad faith and that the evidence at issue was not exculpatory, so there was no need to determine whether both were elements in every case involving destruction of evidence.

In reviewing the other cases cited in McCarthy and by defendant Morgan, I do not see support for the view that a plaintiff must prove both bad faith and that the evidence was apparently exculpatory in every case.  Some of the cases do suggest that a plaintiff must prove *bad faith* in every case, but I did not uncover any cases other than McCarthy that required the plaintiff to show that the evidence at issue was "apparently" rather than just "potentially" exculpatory even when the official acted in bad faith.  E.g., Henry v. Page, 223 F.3d 477, 481 (7th Cir. 2000) ("Since he has demonstrated no bad faith by the government, there is no constitutional violation.").

30

In Armstrong and Hart, the court of appeals did not discuss cases such as McCarthy and Henry. Either in this case or another, the court may need to reconcile these seemingly divergent lines of authority. However, I need not attempt to do so in this opinion. In her reply brief, even Morgan seems to concede implicitly that the court of appeals misstated the law in McCarthy because she drops her argument that plaintiff must prove that the semen stain was "apparently exculpatory" even if he shows that defendants acted in bad faith. Accordingly, it is unnecessary to consider that aspect of McCarthy. Further, because I conclude that plaintiff has adduced sufficient evidence to prove that Morgan (and Daily) acted in bad faith, I need not decide whether that is required in every case.

## C. Bad Faith (Both Defendants)

In my view, there are several key facts that, if proven, would form the foundation for the drawing of an inference that Morgan and Daily acted in bad faith to destroy the semen stain: (1) they knew that there was evidence implicating plaintiff's brother, Stephen Armstrong, in Kamps's murder; (2) they knew that the Y-STR testing could not distinguish among paternal relatives like plaintiff and Stephen Armstrong; (3) they knew of a risk that the test would consume the sample so that it could not be retested; (4) they were personally involved in the decision to choose the Y-STR testing method; and (5) there were alternative tests that could have been used to identify the donor of the semen stain more precisely. If each of these things is true, then it would be reasonable for a jury to infer that defendants chose Y-STR testing intentionally in order to prejudice plaintiff's defense. Again, the

31

question is a close one, but I conclude that plaintiff has adduced sufficient evidence on each of these issues to allow him to present his claims to a jury.

With respect to defendants' knowledge of evidence against Stephen Armstrong, defendant Morgan does not deny that, as the lead detective on the case, she was aware of the allegation from 1995 that Stephen Armstrong had confessed to Kamps's murder.   In addition, it is undisputed that Morgan heard a new allegation in May 2006 that Stephen Armstrong was the killer.   Defendant Daily denies that she knew about the allegations against Stephen Armstrong, but she admits she received the case file from the police department when she began working on the case and that she reviewed at least some of those documents.   This is enough to permit the drawing of an inference that Daily knew that Stephen Armstrong was a possible suspect.

Both Daily and Morgan deny that they knew about the limitations of Y-STR in 2006. However, it was Daily who first suggested Y-STR testing.   If she knew enough about the test to propose it, then it is reasonable to infer she knew about its limitations as well.   Further, Daily admits that she knew that Y-STR testing was "less discriminating" than other kinds of tests and that it was better used as a test for eliminating someone rather than identifying someone.   Again, if she knew this, it is reasonable to infer that she was aware of other limitations.   With respect to Morgan, plaintiff points to a 2005 lab report addressed to Morgan stating that "all paternally related male relatives will share the same Y-STR profile." Dkt. #197-5.   Morgan is free to testify at trial that she did not actually read the report or forgot about it, but the report is enough to raise a genuine issue.

32

Defendant Daily does not deny that, as a senior forensic scientist, she knew that the Y-STR testing could consume the semen stain and prevent retesting. Defendant Morgan says she had no knowledge of this possibility. Plaintiff has no direct evidence to prove otherwise, but he says that it can be inferred reasonably that Morgan learned about this risk during her June 2006 telephone call with Daily and Norsetter. In support, he cites evidence of a conspiracy between Daily, Morgan and Norsetter. I will discuss that evidence below. Although the evidence is not overwhelming, I conclude that it is sufficient to allow plaintiff to proceed to trial.

With respect to the choice of Y-STR testing, neither Daily nor Morgan wishes to take responsibility. It is undisputed that the decision was made during the June 2006 telephone call in which Daily, Morgan and Norsetter participated, but there are no records showing how or why that decision was reached. However, choosing the type of testing was a primary purpose of the call, so it is reasonable to infer in the absence of objective evidence to the contrary that each participant contributed to the decision, which is sufficient to hold all involved parties liable. Atkinson v. Mackinnon, No. 14-cv-736-bbc, 2016 WL 2901753, at *5 (W.D. Wis. May 18, 2016) ("[A] person who influences a decision can be held liable for a constitutional violation, even if he is not the final decision maker.") (citing Jones v. City of Chicago, 856 F.2d 985, 993-94 (7th Cir. 1988), and Johnson v. Johnson, 385 F.3d 503, 527 (5th Cir. 2004).) Particularly with respect to Daily, because she was the forensic scientist on the call and she was the first to suggest Y-STR testing in January 2006, it is reasonable to infer that she influenced the decision. Although the circumstantial evidence

33

is not as strong with respect to Morgan, I conclude that plaintiff has sufficient evidence of a conspiracy to allow him to present his theory to a jury.

With respect to the availability of a better test, there is a genuine dispute between plaintiff and defendants on that issue, so that will have to be resolved by a jury as well.

Finally, plaintiff points to evidence that both Morgan and Daily were biased against him or otherwise engaged in suspicious behavior that is suggestive of a conspiracy.  With respect to Morgan in particular, plaintiff points to two instances in which she failed to follow up on evidence that implicated Stephen Armstrong in Kamps's murder.  In 2006, after receiving a tip about a witness who believed that Stephen Armstrong was the killer, Morgan did not try to contact the witness.  In 2008, when Morgan interviewed Fawn Cave, a woman who alleged that Stephen Armstrong had confessed to the murder, Morgan did not ask Cave about that allegation but instead asked about her relationship with plaintiff and obtained documents about a custody dispute Cave was having.

With respect to both Morgan and Daily, plaintiff points to various irregularities in the process surrounding the 2006 testing of the robe belt: (1) Daily and Morgan did not document their June 2006 telephone conversation in which it was agreed that Y-STR testing would be used on the robe belt, even though Daily had documented other telephone calls about the case; (2) there is no documentation regarding the reasons that defendants chose to use Y-STR testing; (3) neither Morgan nor Daily informed plaintiff's counsel about the testing, despite the court order requiring that counsel receive notice and despite counsel's letter stating that he wanted testing done by an independent lab; and (4) neither Morgan

nor Daily followed general procedure in transferring custody of the robe belt.

Both Morgan and Daily have innocent explanations for all of their conduct and a jury might well believe them.  However, on a motion for summary judgment, I am required to view the facts in the light most favorable to the nonmoving party, in this case the plaintiff. Loudermilk v. Best Pallet Co., LLC, 636 F.3d 312, 314-15 (7th Cir. 2011).  The facts cited by plaintiff raise enough questions about defendants' conduct and motives to demonstrate a genuine issue of material fact on the question whether Morgan and Daily conspired to prevent plaintiff from exonerating himself.

### D. Other Issues

The remaining issues defendants raise do not require extended discussion.  First, the parties agree that the semen stain is at least "potentially exculpatory."  As discussed above, because plaintiff has adduced sufficient evidence of bad faith, he does not have to prove that the stain was "apparently exculpatory."  This makes it unnecessary to decide plaintiff's argument that the state court's July 2009 order precludes defendants from litigating this issue.

Second, with respect to the question whether plaintiff could obtain "comparable evidence by other reasonably available means," defendants raise different arguments. Defendant Morgan says that plaintiff could have relied on the April 2006 report, which excluded plaintiff as a donor to the semen stain.  Defendant Daily says that plaintiff could have retested the nonsperm fraction of the stain because that portion of the stain was not

fully consumed by previous testing.

Neither of these arguments is dispositive, at least not for the purpose of summary judgment. With respect to the April 2006 report, by defendants' own assertion, the report has limited probative value because the sample defendant Daily tested was predominantly female and there was not enough male DNA to create a male STR profile. Thus, a reasonable jury could find that additional testing was needed to provide a more definitive answer. With respect to the possibility of retesting the nonsperm fraction, it is undisputed that the sample likely was contaminated during testing, so retesting would have limited probative value as well. Daily says that there is no evidence that she was responsible for the contamination, but even if that is true, it is irrelevant to this element of the claim. The question is simply whether plaintiff has access to comparable evidence, not whether the defendant was responsible for depriving the plaintiff of that alternative evidence.

Third, defendant Daily devotes much of her briefs to arguing that she did not have a duty under state law to preserve evidence or inform plaintiff of the testing she was doing. These arguments are red herrings. Plaintiff is not proceeding on any claims under state law and his federal law claims are not premised on the view that Daily violated his rights by failing to inform him of anything. Rather, her conduct is simply evidence of bad faith. And even if I assume that Daily complied with state law requirements regarding destruction of evidence, she does not argue that state law *required* her to use the test that she did, so I need not decide whether a party could be excused from constitutional liability if she was forced to choose between violating state and federal law. Cf. N.N. ex rel. S.S. v. Madison

36

Metropolitan School District, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009) (considering situations under which municipality may be held liable for violating Constitution when conduct was compelled by state law).

Fourth, defendants raise a hodgepodge of arguments about causation, that is, whether defendants' conduct in 2006 caused plaintiff to remain in Wisconsin prison for an additional three years before the state court dismissed the charges. This issue was addressed already by the Court of Appeals for the Seventh Circuit. In particular, the court stated that it was reasonable to infer from plaintiff's allegations that, if defendants had not destroyed the semen sample and chosen a more precise testing method, a reasonable prosecutor would not have moved forward with the charges in 2006. The court explained:

> Much of the physical evidence—which the prosecution repeatedly and erroneously portrayed in the 1981 trial as conclusively establishing Armstrong's guilt—had already been thrown into doubt by new DNA analysis and other laboratory findings that led the Wisconsin Supreme Court to conclude that the real controversy of identification was not fully tried. And Daily had concluded from earlier testing of the bathrobe and the belt that Armstrong was excluded as the source of the semen. The destroyed stain on the murder weapon was therefore "the most critical and probative physical evidence remaining in the case," as Armstrong alleges. Its destruction, and especially the potentially false positive generated by the defendants' choice of the Y–STR test, plausibly caused the case to proceed, with Armstrong still in prison, even though the testing of other evidence tended to exculpate Armstrong.
>
> It is also a plausible inference from the complaint that Armstrong's continued imprisonment was reasonably foreseeable to Daily and Campbell at the time they destroyed the semen sample. Again, the results of Daily's first analysis of the bathrobe and the belt had eliminated Armstrong as a possible source of any of the semen stains, including the newly discovered one on the belt. When the crucial sample was destroyed, Daily and Campbell were retesting the stain in an attempt to find inculpatory evidence. In fact, it is reasonable to infer from the allegations not only that Armstrong's continued imprisonment was

> reasonably foreseeable, but also that continued imprisonment was Daily and Campbell's goal in consuming the last of the stain to perform the Y–STR test, which would be so misleading under these circumstances. The factual allegations in the complaint therefore add up to a viable claim that Daily and Campbell violated Armstrong's constitutional rights by destroying exculpatory evidence under both Youngblood and Trombetta, and that the destruction caused Armstrong to be deprived of liberty.

Armstrong, 786 F.3d at 554 (internal citations omitted).  Defendants do not even acknowledge the court of appeals' discussion on this issue, much less explain why the court's reasoning does not continue to apply at the summary judgment stage.  Although defendants argue now that they could not have used a different testing method to obtain more reliable results, that issue is genuinely disputed, so I cannot grant summary judgment on that ground.

Finally, defendants make a half-hearted argument in support of a qualified immunity defense.  Under the doctrine of qualified immunity, a government employee cannot be held liable for a constitutional violation unless that violation was clearly established under the law in existence at the time.  Carroll v. Carman, 135 S. Ct. 348, 350 (2014).  The court of appeals addressed this issue as well.  In particular, the court stated that, if plaintiff could show that defendants destroyed potentially exculpatory evidence in bad faith, that conduct violated plaintiff's clearly established rights under Youngblood and Trombetta.  Armstrong, 786 F.3d at 556.  Because I have concluded that a reasonable jury could find that plaintiff has made that showing, defendants Morgan and Daily are not entitled to qualified immunity at the summary judgment stage.

ORDER

IT IS ORDERED that

1.  The motions for summary judgment filed by defendant John Norsetter and Marion Morgan, dkt. ##117 and 130, are DENIED.

2. The motion for summary judgment filed by defendants Karen Daily and Daniel Campbell, dkt. #136, is GRANTED as to defendant Campbell and DENIED as to defendant Daily.  Plaintiff Ralph Dale Armstrong's complaint is DISMISSED as to his claims against defendant Campbell.

3.  Plaintiff's motion for leave to file a supplement to his proposed findings of fact, dkt. #197, is GRANTED.

4.  Defendant Morgan's unopposed motion to join defendant Daily's motion to strike, dkt. #213, is GRANTED, but defendant Daily's motion to strike the supplemental report of Karl Reich, dkt. #200, is DENIED as unnecessary.

Entered this 29th day of July, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge